Commonwealth *v.* Fields, Appellant.

178

Argued March 24, 1952. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and GUNTHER, JJ.

*Raymond Pace Alexander,* with him *Mitchell S. Lipschutz* and *Lee B. Sacks,* for appellant.

*Michael von Moschzisker,* First Assistant District Attorney, with him *Richardson Dilworth,* District Attorney and *Malcolm Berkowitz,* Assistant District Attorney, for appellee.

OPINION BY HIRT, J., July 17, 1952:

The defendants were jointly tried and were convicted of common law rape and robbery. On return of the verdicts the trial judge peremptorily refused their motions for new trials, without argument, and sentenced the defendants. Their present counsel in arguing these appeals impugned the fairmindedness of the judge in the trial of these cases. We have serious doubt as to the validity of the convictions of these defendants on the present record. And regardless of whether inadequacies in this record amount to reversible error, this is a case in which we are impelled to grant new trials in the exercise of the broad powers of

review conferred upon us in §8 of the Act of June 24, 1895, P. L. 212, 17 PS §192. Cf. *Com. v. Tracey,* 130 Pa. Superior Ct. 15, 196 A. 549; *Commonwealth v. Balles,* 160 Pa. Superior Ct. 148, 50 A. 2d 729.

The jury accepted testimony which standing alone convicted the defendants of the crimes, to this effect: Otis Daniels, since his separation from his wife, has lived alone in an apartment near the corner of 18th and Wilder Streets in Philadelphia. In the early morning of April 1, 1951, he with Hazel Jackson, a widow, were visiting friends in the neighborhood of his home. She referred to him as her "boy-friend". About 3 a.m. he was standing on the corner with her, intending to hail a taxicab to take her home, when they were accosted by the defendants. Defendant Fields was so aggressive in his approach to Mrs. Jackson that she became frightened. To protect her from his advances Daniels took her to his apartment over a nearby store. Both defendants followed them into the apartment and there Fields forced the woman into the bedroom and after threatening her to induce her to accede to his demands, raped her while Aygelotte stood over Daniels with a "pen knife". Fields then restrained Daniels in the same manner, while Aygelotte raped the woman. The acts were repeated several times by the defendants, alternately, until about 6 o'clock in the morning when the defendants left. As to the robbery charges there is testimony that one of the defendants took $12 from the victim's purse and the other robbed Daniels of $13. Mrs. Jackson went home in a taxicab. Daniels reported the affair to the police shortly after the occurrences and later in the same morning took Mrs. Jackson to the detective headquarters. She fainted in the police station and was taken to a hospital where after treatment she was returned to her home the same day. She had been steadily employed but was unable to return to her work for two weeks.

In their defense each of the defendants admitted one act of intercourse with the woman but they testified that it was with her consent. They denied threatening either her or Daniels with a knife. They said that Daniels invited them to his apartment and there offered the woman to them for $25. In response Fields told Daniels that he had $25 and accepted the offer for himself and for Aygelotte. Their testimony is that they left the apartment about 4 a.m.; that just before they left, in response to Daniels' demand for the payment of $25, Fields admitted that he didn't have any money; Daniels then said to him: "I will fix you if it is the last thing I do". The defendants denied the robberies.

Daniels was an essential witness for the Commonwealth and there are circumstances which question his credibility. He intended to give the impression that he retreated to his rooms with Mrs. Jackson as a refuge for her and that the defendants forced their way into his apartment against his will. What he said at the trial does not support the contention. He testified that when he started to close the street door behind him and Mrs. Jackson, Fields said: " 'Oh no, you can't do this on me' I was tricked because he knew me—I didn't think he meant it, and I said, 'Well, all right, come on in.' " At that time Daniels knew what was in Field's mind for when he first accosted Daniels with Mrs. Jackson on the street Fields said to Daniels: "I want her." There then followed a conversation, between Fields and Daniels apart from Mrs. Jackson, on the street. All of the circumstances raise a grave suspicion that the defendants came to Daniels' apartment, if not on his invitation, at least with his consent. The inference is reasonable that Daniels could have excluded both of them from his apartment if he had so intended. Moreover, it may be a fact of some significance that it took the police 39 days to locate the de-

fendants on the description and information given them by Daniels, although Fields was known to him. Fields was arrested on May 9, 1951, at his home on South Eighteenth Street only a block away from Daniels' home. Bearing on the validity of the defense interposed, the fact that Fields and Daniels were known to each other may be an important fact on the question of the guilt of defendants. Is it probable that Fields would have committed robbery and rape in the home of one who knew him and who most certainly would cause his arrest?

There were incidents in the trial which operated to the disadvantage of the defendants through no fault of theirs. Going to the credibility of Mrs. Jackson the notes of her testimony at the magistrate's hearing were offered in evidence to prove prior inconsistent testimony on matters germane to the issue. The notes were admissible to impeach the witness. Act of May 9, 1949, P. L. 1028, §12, 42 PS §1140, amending prior legislation. And under the circumstances the court well might have admitted the transcript of her prior testimony although ground had not been laid for its admission by first calling her attention to the contradictions. Cf. *Commonwealth v. Dilsworth,* 289 Pa. 498, 137 A. 683. However, when the admission of the prior testimony was objected to by the assistant district attorney, defendants' counsel, apparently assuming from comment of the trial judge that the ruling of the court would be against them, abandoned the offer.

Going to the credibility of Otis Daniels, Mr. Sacks of defendants' counsel asked him on cross-examination: "Have you ever been convicted of a crime?" When objected to by the Commonwealth, this colloquy followed: "THE COURT: You cannot ask questions like that. MR. SACKS: I am attacking his credibility. THE COURT: That is a terrible question to ask a man—

you cannot ask that." The inquiry was proper, limited of course to felonies or misdemeanors of the nature of crimen falsi which alone affect credibility. *Commonwealth v. Quaranta*, 295 Pa. 264, 145 A. 89. Technically the question was objectionable. *Commonwealth v. Kostan*, 349 Pa. 560, 37 A. 2d 606; *Commonwealth v. Spanos*, 153 Pa. Superior Ct. 547, 34 A. 2d 902. But criticism of the inquiry was uncalled for and the court properly might have sustained the Commonwealth's objection to the question without comment. Undoubtedly because of the attitude of the trial judge, defendants' unseasoned counsel were deterred from pressing the inquiry. It is clear that the cross-examination of Hazel Jackson and of Otis Daniels was unduly restricted by the comment of the trial judge and it was only on their testimony that the Commonwealth could convict.

The question whether a verdict is against the weight of the evidence is for the trial court (*Commonwealth v. Attarian*, 129 Pa. Superior Ct. 31, 194 A. 776) and in general refusal of a new trial on that ground is reviewable on appeal only for abuse of discretion. *Commonwealth v. Ransom*, 169 Pa. Superior Ct. 306, 82 A. 2d 547. We cannot say that the defendants are entitled to new trials on that ground alone. It may be noted that there was no corroboration of the Commonwealth's testimony although witnesses were available, who were not called. There was the doctor who saw Mrs. Jackson at the hospital; his testimony as to her physical condition would have been of some value. And the testimony of the taxicab driver in whose car she and Daniels were taken to her home, would have been relevant on the robbery charges. Mrs. Jackson said that neither she nor Daniels had any money and the driver waited while she went into her house and extracted the amount of the fare from a "penny bank". In our view, infirmities in the testimony, coupled with

incidents of the trial which prejudiced these defendants, justify the award of new trials in the interests of justice under our statutory powers.

These defendants may be guilty. All they are entitled to is a trial in which, with the aid of counsel, they may be permitted to develop all of the material facts favorable to them. We understand that counsel who argued these appeals on their behalf will either represent them at a retrial of these cases or will see to it that they are adequately represented.

Judgments of sentence reversed with a venire as to each defendant.